IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:06-cr-00385-JO |
| | ) | |
| v. | ) | |
| | ) | |
| JOHNNY BROWN, | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| Defendant. | ) | |

JONES, J.

After a jury trial, Defendant Johnny (Mickey) Brown was convicted of wire fraud, false statements to a financial institution, and tax evasion. Judge King sentenced Defendant to 130 months' imprisonment, and ordered that he pay $6,254,578 in restitution.

Defendant now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, claiming that he received ineffective assistance of counsel from his principal trial attorney, Matthew Schindler. Def.'s Mot. for Relief, ECF No. 338 (filed pro se); Def.'s Am. Mot. for Relief, ECF No. 388 (filed by appointed counsel). For the following reasons, I deny Defendant's Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Defendant's Criminal Conduct

In 1984, Defendant began working for Kirby Vacuum, selling vacuum cleaners door-to-door. Presentence Investigation Report (PSR) ¶ 91. By all accounts, Defendant was a superb

salesman, becoming one of the most successful Kirby distributors in the United States. As a distributor, Defendant purchased standard vacuum cleaners directly from Kirby for about $350 and sold them to customers for about $1,500. PSR ¶ 25. An experienced former Kirby distributor who knew Defendant testified that for about ten years, Defendant was a member of the "Golden Circle," "the top elite group" of Kirby distributors who purchased and sold at least 2,400 vacuum cleaners each year. Trial Transcript (Tr.) 187-88 (testimony of Marshall Herron), ECF No. 275.

In 1995, Defendant married Lili Andersen, another Kirby distributor. Lili Andersen Brown was later indicted as a co-defendant.[1]

Defendant operated his Kirby distributorship in Tigard, Oregon. In 2001, one of Defendant's employees, Dalma Franulovic, set up a merchant account at a U.S. Bank branch in Sherwood, Oregon, located in a grocery store. Although Defendant controlled the merchant account, it was in Franulovic's name, not Defendant's.

Many of Defendant's customers purchased vacuum cleaners on an installment plan, and Defendant and his wife set up their own financing business, American First Financial, for such customers. Through the financing business, Defendant could determine which customers had credit cards with little or no outstanding balance.

Between 2001 and 2003, Defendant recruited customers to participate as investors in the fraudulent scheme charged in the indictment. Defendant used several methods to persuade individuals to allow him to use their credit cards. For example, after a customer purchased a vacuum cleaner, Defendant would meet with the customer at the customer's home, ostensibly to

---

[1] In 2007, Lili Andersen Brown pleaded guilty to one count of tax evasion, and the other charges against her were dismissed. ECF No. 106 (transcript of plea hearing). In 2009, she was sentenced to four months' imprisonment. ECF No. 118 (judgment). She was also ordered to pay $130,871 in restitution. PSR ¶ 23.

explain the vacuum's operation, provide spare bags, and discuss whether the customer was satisfied. Defendant would tell customers "how successful his Kirby business was, and how he was having trouble keeping inventory in stock, and the complexities of his cash-flow situation." PSR ¶ 26. Defendant would claim that he and the customer would mutually benefit if Defendant was allowed to use one or more of the customer's credit cards, in effect loaning money to Defendant so he could "invest in inventory without having to go through an outside financial agency, which would cost more." PSR ¶ 27. In return for use of the credit card, Defendant promised to pay dividends based on vacuum sales, at monthly rates of 1% or 2%. Defendant assured these investors that there was no risk to them, and that he would pay off the credit card's outstanding balance whenever they decided to end the arrangement.

Defendant courted potential investors by showing them that his business was successful, bringing them to his bustling Kirby office. Tr. 232-48 (testimony of Sally Krouth). Defendant also recruited investors from the Living Water Christian Assembly in Albany, Oregon, a church he and his wife attended and financially supported. PSR ¶ 29. Many of Defendant's victim investors trusted him as an "upstanding Christian." PSR ¶ 48.

After obtaining credit cards, Defendant had them swiped through the U.S. Bank point of sale terminal in his Kirby offices. The point of sale terminal registered the credit card transactions as sales of merchandise, although Defendant had not sold anything. The cash advances were then deposited directly into Defendant's merchant account with U.S. Bank.

Defendant used money he obtained from the credit card transactions to pay personal and business expenses. "The largest business expense was the monthly debt service on 596 credit cards and payments of 'dividends' to the many victim investors." Gov't Resp. 3. Defendant's need to continue paying "dividends" to investors by recruiting new investors is one hallmark of a

Ponzi scheme, which the Ninth Circuit has described as "a financial fraud that induces

investment by promising extremely high, risk-free returns, usually in a short time period, from an

allegedly legitimate business venture. 'The fraud consists of funnelling [*sic*] proceeds from new

investors to previous investors in the guise of profits from the alleged business venture, thereby

cultivating an illusion that a legitimate profit-making business opportunity exists and inducing

further investment.'" *Donnell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting *In re

United Energy Corp.,* 944 F.2d 589, 590 n.1 (9th Cir.1991)).

Defendant used some of the money for personal living expenses such as housing and

clothes.  He made large donations to charitable causes, including tithing $2,000 per month to the

Living Water Christian Assembly.  PSR ¶ 29.  In 2001 and 2002, he funded a festival in Albany,

Oregon, called Summer Fest, offering free food and entertainment.  Tr. 209 (testimony of

Michael Kennedy).

In 2003, Defendant's scheme began to fall apart.  The PSR calculates that between July

2002 and April 2003, the U.S. Bank credit card terminal in Defendant's Kirby business

processed more than $4.8 million, of which only 9% went for Kirby inventory.  PSR ¶ 34; Gov't

Resp., Ex. 8, at 48.

U.S. Bank discovered Defendant's fraud in early March 2003, when a U.S. Bank

investigator noticed that a couple had each applied for a credit card and line of credit at the

Sherwood branch bank, and immediately took all the available money and deposited it into

Defendant's merchant account.  PSR ¶ 37.  A bank employee told the investigator that the couple

had come to the bank with Defendant, and that Defendant and his wife "had been bringing

people in for months for credit or real estate loan applications, and that all the bank employees

were participating."  PSR ¶ 37.  "The investigator started pulling records and noticed that the

typical 'new applicant' was an elderly woman with good credit." PSR ¶ 38.  When the

investigator called five of these women, they could not explain precisely what they had

purchased from Defendant.  In light of this evidence, on March 7, 2003, U.S. Bank froze

Defendant's merchant account and disallowed further purchases on the credit card machine in

Defendant's Kirby office, pending further investigation.

      After U.S. Bank froze his merchant account, Defendant knew that many of the investors'

credit cards would soon be in default.  On March 12, 2003, Defendant discovered that although

the credit card terminal could no longer process sales, it could still process refunds.  He had his

employees run as many cards as possible through the terminal, reversing the charges based on

fictional customer refunds or "chargebacks."[2]  Defendant was able to transfer about $1 million in

debt from about 100 cards.  The next day, however, a monitoring company noticed the unusual

activity in Defendant's merchant account and fully disabled the credit card terminal.  The

chargebacks eliminated some of the debt owed by the cardholders, transferring the debt to

Defendant's now empty merchant account.

      Defendant then tried to shift millions of dollars in remaining cardholder debt by directing

individual cardholders to submit credit slips to the credit card companies.  The credit slips stated

that the cardholders were disputing the charges because they had not received merchandise they

had ordered.  In fact, the cardholders had never ordered merchandise from Defendant.

Defendant used various explanations to persuade the cardholders to use the credit slip plan.

Some agreed, while others refused, considering the plan unethical and choosing instead to take

on the debt themselves.  It took weeks for U.S. Bank to discover Defendant's credit slip scheme.

---

[2]  Mary Erdman, an employee of U.S. Bank's subsidiary Elavon, testified that in merchant accounts, U.S.
Bank advances funds to the merchant for credit card sales, which are then repaid by the credit card banks.
If a credit card sale is later credited or reversed, the merchant's U.S. Bank account is charged for the
credit, which is referred to as a chargeback.  Tr. 201.

Defendant succeeded in transferring more than $4.2 million in debt from individual cardholders to U.S. Bank.

Later in 2003, Defendant and his wife learned that federal authorities were investigating them. Their businesses soon failed.

The PSR includes brief statements from more than 20 individual victims. The government contends that Defendant defrauded more than 50 individual victims, citing an exhibit summarizing ledger cards kept by Defendant and his employees indicating amounts owed to 154 cardholders with 596 credit cards. Gov't Resp. 23 & Ex. 10 (Trial Ex. 6). At sentencing, however, Judge King applied a two-level guideline enhancement based on 25 to 50 victims. Gov't Resp., Ex. 9, at 57 (transcript of sentencing hearing).

## II. Pretrial Proceedings

In 2006, a grand jury issued a 30-count indictment against Defendant, charging him with false statements to a financial institution, mail fraud, bank fraud, access device fraud, and tax evasion. The grand jury later returned three superseding indictments. In the final indictment, the Fourth Superseding Indictment, issued in 2009, Defendant was charged with seven counts of wire fraud in violation of 18 U.S.C. § 1343; six counts of false statements to a financial institution in violation of 18 U.S.C. § 1014; and one count of tax evasion in violation of 26 U.S.C. § 7201. Gov't Resp., Ex. 4 (copy of Fourth Superseding Indictment). While the charges against him were pending, Defendant remained on release, generally under the supervision of the U.S. Pretrial Services, until after sentencing in December 2011. PSR ¶ 96.

Defendant was represented by court-appointed counsel. As of March 2009, attorney Thomas Coan represented Defendant. When Defendant became dissatisfied with Coan's representation, Judge King appointed Matthew Schindler as co-counsel. Gov't Resp., Ex. 1,

Schindler Decl. ¶ 6. Because Defendant continued to have "communication and trust issues"
with Coan, in June 2010, Judge King granted Defendant's request to substitute Schindler as lead
counsel. Schindler Decl. ¶ 7.

Because the adequacy of Schindler's representation of Defendant is the focus of the
current motion, Schindler's qualifications and experience are relevant. He graduated from Lewis
and Clark Law School in 1995. While attending law school, he worked in Portland as a law
clerk for the Federal Public Defender's office and as a certified law student for the Metropolitan
Public Defender. After passing the California and Oregon bars, he worked for two experienced
federal criminal defense lawyers and then took a position with the Metropolitan Public
Defender's office, trying about 30 misdemeanor cases in 18 months. He then worked for several
federal criminal defense lawyers, working as co-counsel on a counterfeiting case in federal court
and a complex fraud case.

In 1998, Schindler began accepting appointments as a member of the Criminal Justice
Act (CJA) panel. Since then, he has exclusively practiced criminal defense in federal court.
Schindler Decl. ¶ 3. By 2018, Schindler had tried five complex multi-defendant cases, and was
counsel on more than 200 federal cases, a third of which were financial or white-collar criminal
cases. As of 2011, however, this case was Schindler's first complex federal fraud trial as lead
counsel. Schindler Decl. ¶ 8.

Schindler filed a pretrial motion to dismiss the indictment and, through co-counsel Lynne
Morgan, a motion in limine to exclude much of the government's evidence. Both motions were
unsuccessful. When the motions were denied, Schindler "had to formulate a trial strategy
knowing virtually all the government's evidence on all counts would be admitted." Gov't Resp.
12.

### III. Trial and Sentencing

#### A. Trial

Defendant's jury trial began May 3, 2011. In preparing for trial, Schindler states that based on advice from other federal criminal defense lawyers, and his own experience, he "came to believe that a conservative strategy where one did not call witnesses and generally relied on the presumption of innocence and the burden of proof was the correct way to litigate in federal court." Schindler Decl. ¶ 8.

Schindler decided "to have the jury focus on the corporate bank whose avarice and facilitation of the offense made it far less sympathetic than either the people at the local bank branch that [Defendant] manipulated or the individual cardholder victims that he misled about his ability to repay them." Schindler Decl. ¶ 12. Schindler notes that Defendant effectively guaranteed a 40% interest rate for investors, even though he "knew at the time that was unsustainable because he had previously engaged in a similar financing scheme involving American Express and he ended up owing them nearly $1 million." Schindler Decl. ¶ 12 (the American Express situation is not at issue here). In short, Schindler thought "it would be easier to paint the corporate bank as the villain rather than an elderly, infirm woman who invested because of [Defendant's] religious appeals." Schindler Decl. ¶ 12.

Schindler states that he decided to focus on the bank after he and his co-counsel spoke to "some of the investor witnesses," who "came across as vulnerable and very sympathetic." Schindler Decl. ¶ 13; ¶ 15 ("We interviewed two or three of the credit card investors and they came across as decent honest people who wanted to help [Defendant] as much as they expected to make any money."). Schindler also "reviewed the government's memos regarding interviews of more than 100 people" who loaned credit cards to Defendant. Schindler Decl. ¶15.

Describing himself as "a large and loud man," Schindler chose to have co-counsel Lynne Morgan cross-examine the individual victims, to avoid the appearance of "attacking an elderly woman for loaning [Defendant] her credit card." Schindler Decl. ¶ 14. Schindler decided that other than pointing out Defendant's efforts to repay investors, he did not and does not see any benefit to focusing on "those individuals who lost money and refused to participate in the chargeback scheme," or arguing about the "technical terms of their agreements" with Defendant. Schindler Decl. ¶ 14.

Before his scheme fell apart, Defendant had sought information from Phil Goldsmith, an attorney who was an expert on debtor-creditor law, using the information "selectively to support the chargebacks." Schindler Decl. ¶ 17. When Schindler later interviewed Goldsmith while preparing for trial, Schindler decided not to call him as a defense witness because he "did not have a favorable view of [Defendant's] conduct." Schindler Decl. ¶ 17. Goldsmith's negative view of Defendant's conduct also dissuaded Schindler from calling another expert on the topic.

In the preliminary jury instructions, Judge King told the jury that to prove the wire fraud charges, the government had to prove that Defendant "made up or participated in a scheme to defraud U.S. Bank, credit card companies, and individual credit cardholders to obtain money from them by false statements." Gov't Resp., Ex. 2, at 2 (trial transcript). Schindler decided to focus on the bank because the evidence of Defendant's misrepresentations to the investor victims was very strong, and the government could not prove the wire fraud counts unless it could show the bank was a victim. Schindler states, "If the jury agreed that the bank was not a victim because of its malfeasance, then we win." Schindler Decl. ¶ 13. Schindler hoped that his strategy "might create confusion with the jury and lead to a hung jury." Schindler Decl. ¶ 20.

During the deliberations on May 10, 2011, the jury sent two notes asking whether the

government needed to prove all three categories of alleged victims were defrauded.  Gov't Resp., Ex. 3, at 6-14 (trial transcript).  The next day, the jury found Defendant guilty on all charges.

**B. Sentencing**

The U.S. Probation Office prepared the draft PSR on October 3, 2011.  The draft PSR recommended a 300-month prison term.

On November 30, 2011, Schindler submitted a 16-page memorandum with comprehensive objections to the draft PSR.  Gov't Resp., Ex. 8, at 37-52.  Schindler argued that the proposed sentence was "completely out of proportion," providing a chart of sentences imposed in other fraud cases from this district and other districts across the United States.  Ex. 8, at 37.  Schindler also objected to the financial loss calculation and most of the proposed guideline enhancements.

In the final PSR, which included responses to Schindler's objections, the Probation Office adhered to its sentencing recommendation.  The PSR concluded that individual cardholders suffered "[c]omplete financial ruin . . . now coupled with deep personal pain, as most of [Defendant's] victims believed he was their friend, fellow parishioner, and as he was often described, 'a man of God.'"  PSR ¶ 46.

Shortly before the sentencing hearing, Schindler met with Defendant.  Based on numerous sentencings he had handled before Judge King, Schindler knew "it would be favorable if [Defendant] could muster some kind of apology even if he did not concede his guilt."  Schindler Decl. ¶ 22.  Schindler spent two days persuading Defendant to agree to give a four-sentence statement of apology.

At Defendant's allocution, however, he rejected Schindler's advice, instead delivering a rambling statement that included equivocal apologies but also blamed his impoverished

upbringing for his crimes.  He also personally addressed several victims who were sitting in the courtroom.  At one point, Defendant produced a cashier's check for $100, stating "If I never get to pay another cent, I'm clear in my heart, I can say I paid something." Gov't Resp., Ex. 9, at 47 (sentencing transcript).  Schindler states that the transcript "does not convey the look on Judge King's face as [Defendant] waived [*sic*] around a cashier's check that represented his first $100 restitution payment and shouted about being sorry.  It might be the only time I ever saw this judge visibly angry and he was going to order [Defendant] detained that moment." Schindler Decl. ¶ 22.  Schindler was able to persuade Judge King to allow Defendant to remain out of custody during the Christmas holidays.

Judge King imposed 130 months' imprisonment, a favorable result given the 300-month recommendation.  Schindler states that Defendant's misguided sentencing allocution was the "single biggest factor" in Defendant "receiving a sentence of 130 months instead of something less." Schindler Decl. ¶ 22.

On appeal, the Ninth Circuit affirmed in two separate decisions.  784 F.3d 1301 (9th Cir. 2015) (within district court's discretion to proceed with jury deliberations with 11 jurors after excusing juror for illness); 601 F. App'x 565 (9th Cir. 2015) (mem. disp.).  The Supreme Court denied certiorari. ___ U.S. ___, 136 S. Ct. 250 (2015).

## LEGAL STANDARDS

### I.  Motions Under 28 U.S.C. § 2255

Under 28 U.S.C. § 2255, a federal prisoner in custody on a sentence after conviction may move the court that imposed the sentence to vacate, set aside, or correct the sentence because:

> [T]he sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . .

28 U.S.C. § 2255(a).  To prevail on a motion under § 2255, a defendant must show that an error

of constitutional magnitude occurred and that the error had a substantial and injurious effect or

influence on the guilty plea or the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637

(1993).

## II.  Ineffective Assistance of Counsel

To prevail on a claim for ineffective assistance of counsel, a defendant must show that his

attorney's performance was unreasonable under the prevailing professional standards and that

the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668,

694-95 (1984).  If the defendant fails to show either incompetent performance or prejudice, the

court "must dismiss the claim."  *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir.

2002).

There is a strong presumption that counsel's conduct is reasonable.  *Hendricks v.

Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995).  "Review of counsel's performance is highly

deferential."  *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986).

To establish prejudice, the defendant must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694.  "It is not enough 'to show that the errors had some conceivable

effect on the outcome of the proceeding.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2011)

(quoting *Strickland*, 466 U.S. at 693).  Rather, "[c]ounsel's errors must be 'so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Id.* (quoting *Strickland*, 466

U.S. at 687).

## DISCUSSION

### I. Schindler's Declaration

In Schindler's declaration, filed more than seven years after the trial, he states that "the case could have been defended differently and that might have led to a different result. I further acknowledge that with the experience I have now, I would try the case differently, and in particular I would have called defense witnesses. At the time, however, I believed that I was making the appropriate tactical decisions which were both confirmed by [the] client and by co-counsel and prior counsel." Schindler Decl. ¶ 21.

I agree with the government that while Schindler's candor may be commendable, his statements do not show that his representation of Defendant was ineffective. Gov't Resp. 10. The court "must make every effort 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 988 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). I conclude that Schindler performed competently in litigating what Judge King called "one of the toughest cases I've handled in the 13 years I've been a federal judge." Gov't Resp., Ex. 9, at 52 (sentencing transcript). Furthermore, the Ninth Circuit concluded on direct appeal that "there was overwhelming evidence of guilt." 601 F. App'x at 566 (addressing whether district court erred in excluding evidence of the absence of flight). Because the evidence against him was so strong, Defendant cannot show that he was prejudiced by Schindler's representation.

### II. Defendant's Pro Se Motion

In Defendant's pro se motion, he argues that Schindler should have presented expert testimony "to analyze the amounts of charges on credit cards, and to make a calculated

assessment of whether this defendant could maintain a reasonable belief of his ability to pay back the amounts willingly lent to him by investors on their credit cards, based on other investments and assets." Def.'s Mot. 4. Such evidence, if it existed, would not be relevant. The Ninth Circuit has flatly rejected the argument that a defendant "was not guilty of wire fraud because he intended to pay back the funds he deceptively obtained." *United States v. Miller,* 953 F.3d 1095, 1103 (9th Cir.), *petition for cert. filed,* ___ U.S.L.W. ___ (U.S. Sept. 20, 2020 (No. 20-5840). The court explained that the wire fraud statute does not require "an intent to permanently deprive a victim or money or property." *Id.* (footnote and citation omitted).

Defendant also argues in his pro se motion that Schindler was incompetent for failing to present defense witnesses. Def.'s Mot. 4. Although Schindler now states that he should have called as many defense witnesses as possible, I find that Schindler's decision at the time was reasonable in light of his decision to focus on the corporate bank's conduct, which was far less sympathetic than the individual cardholders were. Furthermore, if Schindler called witnesses to testify that Defendant paid them as he had promised, the government could explain that Defendant "repaid investors with other investors' money, a key component of [Defendant's] Ponzi scheme." Gov't Resp. 13.

Schindler also reasonably decided not to call attorney Phil Goldsmith, an expert on debtor-creditor law. Goldsmith's testimony would not have helped Defendant, given Goldsmith's disapproval of Defendant's conduct.

### III. Defendant's Amended Motion

In the amended motion, Defendant argues that Schindler misread the indictment as alleging that Defendant defrauded only U.S. Bank, when the indictment actually charged Defendant with defrauding U.S. Bank, the individual investors, and the credit card companies.

In his declaration, Schindler explains that he correctly understood the indictment but chose to focus on U.S. Bank because its "avarice and facilitation of the offense made it far less sympathetic" than the other victims. Schindler Decl. ¶ 12. In light of the compelling evidence that Defendant defrauded the sympathetic investor victims, Schindler concluded the only chance of acquittal was to persuade the jury that the bank was not a victim. I conclude that Schindler's strategy was reasonable, although obviously unsuccessful, under these facts. As the Supreme Court has noted, there are "countless ways to provide effective assistance." *Strickland*, 466 U.S. at 691.

In his reply brief, Defendant argues that Strickland was ineffective because he intentionally misled the jury by focusing on the bank's conduct. Def.'s Reply 608, ECF No. 405. I disagree with Defendant that Schindler's tactic had "zero realistic chance of success." Def.'s Reply 7. The jury sent two notes asking whether all three categories of victims must have been defrauded, indicating at least the possibility that Schindler cast doubt on the bank's status as a victim. In any event, given the overwhelming evidence of Defendant's guilt, Defendant cannot show prejudice.

Defendant also argues that Schindler should have called exculpatory investor witnesses who had not lost money. Such witnesses, however, would not negate the testimony of the investor witnesses who did lose money because of Defendant's fraud. As noted above, the government could point out that investors were repaid by Defendant at the expense of other investors, some of whom lost their entire life savings. It is speculative at best to conclude that a jury might acquit Defendant of wire fraud even if the exculpatory witnesses outnumbered the witnesses who were harmed.

Defendant also argues that Schindler should have focused on whether Defendant falsely promised investors that they were investing in vacuum cleaner inventory, rather than more generally investing in Defendant's business. Schindler states, however, that "[a]rguing with victims over the technical terms of their agreements with [Defendant] did not seem productive. In any event, at the time, it seemed clear that at least some were 'victims' because irrespective of the specific terms of the investment [Defendant] had failed to tell them that he could not possibly repay the loans." Schindler Decl. ¶ 14. Schindler also states, "It was evident that the promise to repay with interest was what induced the investor's participation, not getting vacuum cleaners." Schindler Decl. ¶ 15. I find that Schindler was not ineffective in addressing this issue.

Defendant argues that Schindler was ineffective in representing Defendant at sentencing. I disagree. The record shows that Judge King sentenced Defendant to a far lower sentence, 130 months, than the 300 months recommended by both the government and Probation. Defendant himself sabotaged his defense with a disastrous allocution in direct defiance of Schindler's wise advice to make a short and simple apology.

Defendant argues that this court should examine whether Schindler was ineffective at the restitution hearing. Defendant, however, concedes that the Ninth Circuit has ruled that a defendant may not challenge a restitution order in a proceeding under § 2255. *See United States v. Thiele*, 314 F.3d 399, 400 (9th Cir. 2002) (claims for "relief from a restitution order . . . cannot be brought in a § 2255 motion, whether or not the motion also contains cognizable claims for release from custody").

## IV. No Evidentiary Hearing Is Necessary

Section 2255(b) provides:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served

upon the United States attorney, grant a prompt hearing thereon, determine the
issues and make findings of fact and conclusions of law with respect thereto.

Here, I conclude that "the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief." The record includes the relevant transcripts, a declaration from

defense counsel, and supporting documents and exhibits.

Defendant has not earned the right to a hearing by alleging "specific facts which, if true,

would entitle him to relief." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996). I

therefore deny an evidentiary hearing.

## CONCLUSION

Defendant's Motion and Amended Motion to Vacate, Set Aside or Correct his Sentence

under 28 U.S.C. § 2255, ECF Nos. 338, 388, are DENIED.

IT IS SO ORDERED.

DATED October, 16, 2020.

Robert E. Jones
United States District Judge